IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Greggory Tank, | ) |
| Plaintiff, | ) **ORDER GRANTING IN PART** |
| | ) **AND DENYING IN PART MOTION** |
| vs. | ) **TO EXCLUDE LEASE EVIDENCE AND** |
| | ) **GRANTING MOTION TO EXCLUDE** |
| Petro-Hunt, L.L.C., | ) **PLAINTIFF'S EXPERT ECONOMIST** |
| | ) Case No. 1:16-cv-366 |
| Defendant. | ) |

This is an action by plaintiff for compensation under N.D.C.C. § 38-11.1-04 for damages resulting from defendant using 5.74 acres of his property for a wellsite for the drilling and operation of an oil well. In a prior order, the court denied defendant's motion in limine to exclude all of defendant's damage evidence.

Before the court now are two additional motions limine brought by the defendant. One is styled as a Motion in Limine to Exclude Irrelevant Documents. The other is a Motion in Limine to Exclude Plaintiff's Expert.

I.  **BACKGROUND**

A.  **Defendant's wellsite**

Defendant's 5.74 acre wellsite is located in the SW¼SW¼ Section 10, T151N, R196W, McKenzie County, North Dakota, approximately three miles southwest of the small town of Keene and just under twenty miles northeast of Watford City. The wellsite is located along the south section line of Section 10, a little east from the southwest corner of the section. County Road 12 runs east to west on the south section line, providing direct access to the wellsite. Not only is County Road 12 paved, it intersects with North Dakota State Highway 23 just under a mile east from the wellsite.

1

According to defendant's appraiser, Highway 23 is the primary highway between New Town and Watford City.

Plaintiff owns all of Section 10, except for the NE¼. He also owns other land in the immediate area. The land owned by plaintiff in Section 10 is a mixture of crop and pasture land. There is a farmstead located less than a half mile due east of defendant's wellsite. Like the wellsite, the farmstead is abounded on the south by County Road 12.

Previously, defendant's wellsite was part of a large area of cropland that appears to encompass roughly 2/3's of the west half of the SW¼ of Section 10 and extends northward into the NW¼. Notably, there appears to be several other oil wells located in the NW¼ and NE¼ of Section 10.

### B. Plaintiff's evidence of damages for loss of use

Plaintiff has retained David Saxowsky as an expert witness. Saxowsky has a Master's Degree in Agricultural Economics from North Dakota State University and a Juris Doctor from Ohio State University. He currently is employed as an associate professor at the North Dakota State University's Department of Agribusiness and Applied Economics and an adjunct professor at the University of North Dakota School of Law. Defendant has moved to exclude Professor Saxowsky's testimony on the grounds that it amounts to nothing more than opinions about what the law governing surface owner compensation is or should be. Professor Saxowsky's opinions will be addressed in more detail below.

Plaintiff also seeks to introduce as exhibits three leases of other property he owns in the area that he leased for industrial purposes. Plaintiff contends that the jury, armed with general economic principles that will be testified to by Dr. Saxowsky, will on their own be able to properly evaluate and give appropriate weight to the rental amounts set forth in the three leases in determining what

is an appropriate annual lease rental for the 5.74 acres. In addition, plaintiff states he will also testify and that his landowner's opinion as to an appropriate annual lease rental will, in part, be based on the rentals he is receiving under the three leases. Defendant in its motion to exclude irrelevant documents seeks to exclude all evidence of the three leases, contending they are too dissimilar to defendant's use of the 5.74 acres to be relevant. In the alternative, defendant argues that plaintiff should not be allowed to discuss them because, according to the defendant, only an expert can properly assess their significance, which Professor Saxowsky has not done.

    C.    **Defendant's appraisal**

Defendant has retained an expert appraiser. Defendant's appraiser has treated as one unit for purposes of his appraisal the three quarters of land that plaintiff owns in Section 10, which he estimates to be 476 acres. Defendant's appraiser then opines that the "highest and best" use of the wellsite property, prior to it being applied for that purpose, was agricultural cropland after applying the following criteria: legal permissibility; physical possibility, financial feasibility; and maximum productivity. Defendant's appraiser discount the likelihood of the 5.74 acres being used for any industrial or commercial uses based on what he considers to be the property's remote location. He also states that, while some scattered commercial and industrial uses exist throughout the county, there has been little new development lately due to the downturn in oil prices. Notably, defendant's appraiser did not take into account in arriving at this latter opinion any of the three leases that plaintiff entered into to lease other property in the area for industrial uses.

Defendant's appraiser comes up with two damage numbers for plaintiff's loss of use of the 5.74 acres. One is an amount for a single payment of $7,749 for all damages past and future. He arrives at this amount by first multiplying the 5.74 acres times $1,500, which he determined to be the market value of the cropland based on a comparable sales analysis that involved comparing seven

sales of agricultural property in McKenzie County, several of which appear to be upwards of thirty miles away, to the 476 acre unit containing the 5.74 acre wellsite. Defendant's appraiser then multiplies the resulting market value number for the 5.74 acres times 90% as a discount to reflect the fact that plaintiff retains ownership of the property and that he or his heirs at some point will regain its use and possession.

The other damage number that defendant's appraiser calculated is an annual rental value for the 5.74 acres. Defendant's appraiser stated he could not find any comparable rentals of agricultural land in the area so, instead, he estimated the yearly rental value as a percentage of its cropland value. Relying upon USDA statistics and adjusting for the size of the parcel, he concluded an appropriate percentage for the 5.74 acres in this instance was 5%. Using this "return on value" factor, he calculated a rental amount of $430 per year for the wellsite by multiplying the 5.74 acres times $1,500 times 5%. Notable for what comes next, this is an annual rental on a per acre basis of $75 per acre per year - far less than the more than $1,000 per acre per that plaintiff appears to be seeking based on the three lease transactions that are the subject of the motion to exclude.

## II.  DISCUSSION

### A.  Plaintiff's statutory right to compensation under N.D.C.C. § 38-11.1-04

Chapter 38-11.1 was enacted to provide compensation to surface owners for the use of their land by mineral developers possessing dominant mineral rights. Prior to the enactment of the chapter, mineral owners possessing dominant mineral rights had the right to use the surface owner's property without payment of compensation so long as the use was not unreasonable.

Relevant here is that § 38-11.1-04 provides:

The mineral developer shall pay the surface owner a sum of money equal to the amount of damages sustained by the surface owner and the surface owner's tenant, if any, for lost land value, *lost use of and access to the surface owner's land*, and lost

4

value of improvements caused by drilling operations.

(italics added). In this case, plaintiff is seeking compensation based on the "lost use of and access to" proviso of § 38-11.1-04. Further, while the language of chapter 38-11.1 is not the most straightforward, this court has previously held that, except when only exploration damages are at issue, the landowner can elect to receive compensation for what is compensable under § 38-11.1-04 in the form of annual payments. Kartch v. EOG Resources, Inc., 845 F. Supp. 2d 995, 1007-08 (D.N.D. 2012); see also N.D.C.C. § 38-11.1-08.1. In this case, plaintiff is seeking annual payments, and it does not appear defendant contests his right to elect annual payments in lieu of a lump sum award.

Also relevant to what comes later is what the North Dakota Supreme Court recently had to say in Mosser v. Denbury Resources, Inc., 2017 ND 169, 898 N.W.2d 406, 417 (N.D. 2017) about the above quoted language from § 38-11.1-04. First, the court held that the right of the surface owner to recover damages under that section is not limited to what might be the diminution in value of the surface owner's property as a result of the defendant's use - at least not in all instances. Second, in terms of recovering for lost use, the court did not say that the particular use by the landowner had to be imminent - at least not in the context of the use that was at issue in that case, which was use of the subsurface pore space for the disposal of saltwater. In particular, the court stated:

> The plain language of N.D.C.C. § 38-11.1-04 requires a mineral developer to pay a surface owner a sum of money equal to the amount of damages sustained by the surface owner for lost land value, lost use of and access to the surface owner's land, and lost value of improvements caused by drilling operations. The plain language of that statute is not limited to whether the owner of a surface estate is currently using or planning to use the pore space in the near future. Rather, the statutory language requires the mineral developer to pay the surface owner for "lost land value, lost use of and access to the surface owner's land, and lost value of improvements." *That language is not limited to a diminution in market value of the owner of the surface estate's interest and includes a surface owner's lost use of and access to a surface owner's pore space at some time in the future regardless of the surface owner's*

5

> *current use or future plan for use of the pore space.* That interpretation is consistent with the legislature's stated purpose for N.D.C.C. ch. 38-11.1 "to provide the maximum amount of constitutionally permissible protection to surface owners and other persons from the undesirable effects of development of minerals" and the legislature's separate rule of construction that N.D.C.C. § 38-11.1-04 "must be interpreted to benefit surface owners." N.D.C.C. § 38-11.1-02.

2017 ND 169, ¶ 29 (italics added).

### B.   The motion to exclude the testimony of Professor Saxowsky

Professor Saxowsky sets forth in his report what he considers to be an appropriate paradigm for compensating surface owners whose property is used by mineral developers possessing the right to develop the property. It includes his belief that the amount of compensation to be paid to the surface owner "should more closely reflect a negotiated contract price that divides the consumer surplus between the surface owner seller and a mineral developer[.]" (Doc No. 22-5, p. 2). He then opines that, in view of the North Dakota Supreme Court's decision in Mosser, compensation should be consistent with a contract measure of damages rather than a tort-based measure. (Id. at pp. 2-3). Finally, Professor Saxowsky does not provide a final calculation of damages, but merely suggests:

> The compensation in this case will range from the impact upon the surface owner (cost) to the value of the property rights to the oil company (price). But comparable sales certainly is an appropriate consideration.

(Id. at p. 7). Further, while he makes a reference to comparable sales, he does not specifically mention the three leases that are the subject of the motion to exclude, much less explain why each would be comparable and how they should be applied in arriving at an opinion of an appropriate annual rental in this case.

After careful review, the court agrees with the defendant that, at bottom, the foregoing are simply opinions about what is the appropriate measure of damages, which, in this instance, is a matter

6

for the court to decide and then instruct the jury on.[1]

### C. Defendant's motion to exclude irrelevant documents

In this motion, defendant seeks to exclude from evidence a number of documents that it is concerned plaintiff will offer in evidence as proof of damages. In response, plaintiff states he intends on offering only three of the documents that are the subject of the motion - those being the previously mentioned leases by plaintiff to third parties of other land in the vicinity for industrial purposes. Hence, the court need only focus upon the three leases.

#### 1. The real estate leases that defendant seeks to exclude

##### a. Vinson lease

One of the three leases that defendant seeks to exclude is a May 2016 lease by plaintiff to Dick Vinson ("Vinson lease") of 27 acres in the SE¼ of Section 3, T150N, R96W for the construction and operation of a natural gas processing plant and storage facility. (Doc. No. 30-5). The initial term of the Vinson lease is for five years with the lessee having the right to renew the lease for five additional five-year terms. The annual rental for the primary term is $1,000 per acre and this amount escalates by $100 for each successive five-year rental term. In addition, plaintiff is entitled each year to receive 4000 gallons of free propane generated from the facility. The 27 acre tract that

---

[1] Further, while Professor Saxowsky's paradigm for compensating the surface owner may be sound as a matter of economic theory and also (depending on one's viewpoint) appropriate as a matter of social justice, it appears to be contrary to what the North Dakota legislature has decided to allow in providing some compensation to surface owners when previously there was none. Professor Saxowsky's opinion that the appropriate compensation should be somewhere between the impact of the development upon the surface owner and the value of the rights to the mineral developer suggests (1) that the jury can consider the latter as a factor in arriving at an appropriate award, and (2) that an appropriate award could be more than the actual loss of use suffered by the surface owner. This is further reflected in his statements:
> Not having the opportunity to negotiate to be compensated for the changed use is a loss of the right to gain from the changed use of the land. The right to negotiate for compensation for the changed use of the land should be considered a distinct "stick in the bundle of rights."

(Doc. No. 22, p. 6). There is no support for these views in the relevant statutory language, even considering the interpretation given it in <u>Mosser</u>. Rather, as relevant here, § 38-11.1-04 limits the jury to considering the "damages" that the surface owner will suffer resulting from the surface owner's "loss" of use of the property. Consequently, Dr. Saxowsky's opinions must be excluded for these reasons as well.

7

is the subject of the Vinson Lease is located adjacent to Highway 23 approximately five miles south of defendant's wellsite.

### b. Clean Energy lease

The second lease that defendant seeks to exclude is a May 2012 lease by plaintiff to Clean Energy Fluids System, LLC ("Clean Energy") for the location of a salt water disposal well and construction of a fluid processing and recycling facility. (Doc. No. 30-4). The Clean Energy lease tract is located approximately 2½ miles south of the tract that is the subject of this action and apparently includes not only the right to use the surface of the leased property but also the subsurface for permanent disposal of saltwater. Under this lease, plaintiff is being paid $1,000 per acre per year plus additional royalties on (1) waste fluids disposed of down the saltwater disposal well, (2) recycled by-products generated by the facilities, and (3) revenues generated by the sale of recovered byproducts. The Clean Energy lease is for an initial term of five years with the lessee having the option to extend the lease for three additional five-year terms.

### c. Boyd Construction lease

The third lease that defendant seeks to exclude is plaintiff's March 2016 lease to Boyd and Company Construction, LLC ("Boyd Construction") of three acres in the SE¼ of Section 3, T150N, R96W, for a temporary staging site for material and equipment being used by Boyd Construction in the construction of a pipeline. (Doc. No. 30-8). This lease was for a very short term: three months, subject to renewal for identical three month terms so long as construction of the pipeline remained uncompleted. The rental for this three acre tract is $1,500 per month.

If Boyd Construction had used the property for a year, then the total amount that would have due under the lease would have been $18,000. This is the equivalent of $6,000 per acre per year, which, if applied to defendant's wellsite would amount to an annual lease amount for the 5.74 acres

of $34,500. This is substantially in excess of the $430 annual lease amount ($75 per acre per year) estimated by defendant's appraiser or even a $5,740 annual lease amount ($1,000 per acre per year) that is the base annual under the Vinson and Clean Energy leases. However, there is no evidence that Boyd Construction used the leased property for a year, much less that it (or anyone else for that matter) would agree to the monthly rental amount in the Boyd Construction lease for a multi-year lease.

> 2. **Defendant's arguments that the three leases are too dissimilar and, for that reason, must be excluded for lack of relevancy and on Rule 403 grounds**

One of the arguments that defendant makes for exclusion of the three leases is that they are too dissimilar both in scope and the purposes for which the land was leased to be relevant for determining what is an appropriate annual rental for defendant's use of the 5.73 acres for an oil well and associated facilities. Hence, according to the defendant, the leases should be excluded under Fed. R. Evid. 401 & 402. In the alternative, defendant argues for exclusion on Fed. R. Evid. 403 grounds, contending that, because of the dissimilarities, the evidence is likely to be misleading and that any probative value is outweighed by the potential for prejudice.

More particularly, defendant contends with respect to the Vinson and Clean Energy leases that the facilities erected under these leases are more substantial in size and operation and also, by their nature, involve risks and uses of the leased property different from an operating oil well and associated facilities, including the lessee's right to use the subsurface for the disposal of waste fluids under the Clean Energy lease. Finally, for both the Vinson and Clean Energy leases, additional considerations are being paid above an annual lease rental, which makes an apples-to-apples comparison difficult according to the defendant. In the case of the Clean Energy Lease, it is additional royalties that the lessee is obligated to pay and under the Vinson lease it is a yearly

9

amount of free propane. As for the Boyd Construction lease, defendant contends the very short term of the lease likely is the reason for its high rental amount (if extrapolated to an annual rental) making it too dissimilar from defendant's use of the 5.74 acres for an indefinite and much longer period of time.

Plaintiff, on the other hand, argues that all three leases should be received as evidence, arguing that any differences are for the jury to consider. Further, even though the court is excluding plaintiff's expert economist (thereby mooting his argument that the jury itself would be able to evaluate the leases armed with the general principles that the economist would opine upon), plaintiff argues that he should be permitted to rely upon the leases as support of an opinion that he will offer as to an appropriate annual rental based on his status as the landowner.

Starting first with the Vinson lease, while it is true that the permitted use is for a different industrial purpose, the court is not convinced at this point this is a basis for excluding the evidence given that both are industrial and energy related and, to the extent there are differences, those can be the subject of cross-examination, argument, and eventually the jury's consideration.[2] Further, while the size of the Vinson tract is greater, the real estate available in the quarter section where the 5.74 acres is located allows for an equally-sized or larger facility than that which is the subject of the Vinson lease. Finally, the Vinson lease property is in relative close proximity to the 5.74 acres and the length of time that plaintiff may be deprived of its use of the property is comparable to what likely may be defendant's use of the 5.74 acres. And, while the Vinson lease does provide for the

---

[2] In its brief, defendant suggests that the "construction and operation of natural gas processing and storage facility" contemplates "risk to the property" greater than that of an operating oil well and associated facilities. Defendant also argues that the operation of a saltwater disposal well also involves greater "risks." While that may very well be, the court looks forward with interest to defendant's more particular evidence and arguments with respect to exactly what the risks are and how they differ from defendant's oil well and associated facilities for material handling and storage.

additional consideration of a limited quantity of free propane, that appears to be something that can be evaluated or more probably just ignored. Consequently, to the extent the defendant's objection with respect to the Vinson lease is that it is too dissimilar, that objection is overruled for now. To the extent there are differences, the court will allow them to be addressed in cross-examination and testimony from defendant's expert. If upon a later renewal of a motion to exclude the evidence, the court later concludes it was mistaken about the probative value, it can instruct the jury to disregard the evidence, all or in part.[3]

The question is perhaps a closer one with respect to the Clean Energy lease given the fact that the lease includes the use of the subsurface for disposal of waste fluids (albeit likely at a very deep location lessening the probability it would ever impact the surface or near surface uses) and the additional royalties to be paid. However, at the end of the day, the lease does provide a yearly rental amount for what plaintiff may testify was the use of the surface; the leased tract is in close proximity to defendant's 5.74 wellsite; the length of the lease is comparable; and the land in question appears likely to also have been agricultural prior to being converted to the industrial use. Consequently, the court will overrule the lack of relevance and Rule 403 objections for now, but subject to the defendant being able to renew its objections after the evidence is presented.

---

[3] Defendant has not explicitly argued that the evidence related to the Vinson lease (or the other two leases for that matter) must be excluded because no reasonable juror could conclude that there is any realistic possibility of the 5.74 acres being used for a purpose other than agriculture. But, even if that was defendant's objection, the court would overrule it - at least for now - given that the 5.74 acre tract is: (1) located along a paved road with immediate access to Highway 23; (2) is located in the heart of where oil recovery and related industrial operations are being conducted; and (3) plaintiff has entered into two leases of agricultural property within the time frame relevant here for industrial purposes that are for more than a short term and relatively close by. In other words, while the jury might conclude it is unlikely this 5.74 acre would ever be used or a commercial or industrial purposes and make its finding of an appropriate annual lease rental accordingly, there is evidence upon which a jury could reach the opposite conclusion. Cf. Hembree v. United States, 347 F.2d 109, 11-13 (8th Cir. 1965) (sufficient evidence to create a jury issue whether condemned pasture land had the potential to be mined for limestone but not with respect to the claim it could be used for residential development). In this case, the situation might be different if the subject tract was not located adjacent to an improved road or the claim is that it should valued as having a potential for a future Walmart.

As for the Boyd Construction lease, the court is concerned that its very short term likely makes it too different. Common sense suggests that the Boyd Construction lease's short term is the reason for amount of the lease rent, which, if converted to an annual lease rent and applied to a longer term, would from all appearances be extremely high. But here, the court does not have to rely only upon common sense; there are the two other nearby leases that plaintiff entered into for longer terms that are for lease rents on an annual basis that are substantially less. Consequently, based on what the court knows now, it is not inclined to allow the jury to consider evidence related to the Boyd Construction lease. However, plaintiff will be permitted to make an offer of proof outside the presence of the jury, at which point the court would have the opportunity to reconsider whether it should be allowed to be considered based upon a more complete record. In the meantime, neither plaintiff nor plaintiff's counsel will be permitted to make mention of the Boyd Lease in the presence of the jury.

Finally, while the court is inclined at this point to allow the jury to consider evidence of annual rentals being paid in the Vinson and Clean Energy leases, the court does agree that the leases themselves should not be admitted into evidence for the jury's consideration unless there is an issue that arises that may require the lease to be admitted in part. This is because the jurors are not experts and the lease transactions here are relevant, if it all, only insofar as they might support an opinion with respect to the appropriate annual rental for the 5.74 acres at issue. Further, the leases contain provisions not relevant here that may lead to juror confusion.

> 3. **Defendant's argument that the evidence of the other leases should be excluded because fair consideration of the transactions requires testimony from an expert**

Defendant argues that, even if evidence with respect to the Vinson, Clean Energy, and Boyd Construction leases might have some relevancy, plaintiff chose not to employ an expert to render an

opinion as to an appropriate annual rental based on the leases and, in this instance, he should not be permitted be permitted to do so himself because he is not an expert.

Under both Eighth Circuit and North Dakota law, a landowner is entitled to express an opinion with respect to the value of his or her property. See, e.g., United States v. 3, 698.63 Acres of Land, More or Less, in Burleigh, Emmons and Morton Counties, State of N.D., 416 F.2d 65, 67-68 (8th Cir. 1969); Deadwood Canyon Ranch, LLP v. Fidelity Exploration & Production Co., No. 4:10-cv-081, 2012 WL 12838275, at *2 (D.N.D. Nov. 13, 2012) (citing Eighth Circuit and North Dakota cases); McCaffery v. Northern Pacific Ry. Co., 134 N.W. 749, 750-51 (N.D. 1912). And here, the court concludes this principle extends to a landowner being able to express an opinion with respect to what he or she would consider to be an appropriate annual rental. Further, a landowner is also entitled to a fair amount of leeway in expressing the basis for any opinion that may be offered, including other transactions that the landowner was involved in assuming they are probative. See, e.g., LaCombe v. A-T-O, Inc., 679 F.2d 431, 433-36 & n.5 (5th Cir. 1982) (addressing the leeway to be given landowner testimony), District of Columbia Redevelopment Land Agency v. Thirteen Parcels of Land in Squares 859, 912, 934 and 4068 in the District of Columbia, 534 F.2d 337, 338-344 (D.C. Cir. 1976) (same and allowing a landowner to testify about his operations at another property in support of his lay opinion); Clark v. United States, 155 F.2d 157, 161-62 (8th Cir. 1946) ("The landowner should be allowed to state and to have his witnesses testify to every fact concerning the property which he would normally or ordinarily be disposed to put forth in order to place it in an advantageous light if he were attempting to negotiate a sale of it to a private individual."); State ex rel. Dept. of Transp. v. Sherrill, 276 P.3d 1060, 1063 (Okla. Ct. Civ. App. 2012) (court did not err in allowing the landowner to testify about the sales prices of other property he owned in the area); cf. LaCombe v. A-T-O, Inc., 679 F.2d 431, 433-36 (5th Cir. 1982).

While not necessarily disputing that the law would permit plaintiff in this case from expressing an opinion with respect to what he believes would be an appropriate annual rental, defendant argues it takes an expert to (1) properly evaluate and ascertain whether the three lease transactions have any probative value in determining what is an appropriate amount for compensating plaintiff for loss of use of the 5.74 acres and (2), if so, what weight should be given to them. The court disagrees. Without having to decide what might be appropriate in other situations, plaintiff in this instance is a party to the leases that the court will permit mention of, so he is personally familiar with the parcels involved and the factors relevant to the annual rentals decided upon - at least from his perspective. In other words, this is not an attempt to use the landowner as a conduit to get before the jury transactions the landowner was not familiar with and would not have formed a basis for the landowner's opinion absent an investigation of the type normally conducted by an expert.

In State ex rel. Herman v. Lopez, the Arizona Court of Appeals succinctly addressed what appears to be defendant's underlying concern and the general response of most courts (including as noted above the Eighth Circuit and the North Dakota Supreme Court) to it:

> In Board of Regents, etc. v. Cannon, 86 Ariz. 176, 342 P.2d 207 (1959), the Supreme Court stated the rule that it is well-established law that an owner of property is always competent to testify as to its value. The State raises the spectre of the possibility that all the owner would have to do in any condemnation case is to come in and testify to some astronomical estimate as to his damages and thereby expand the limits for the jury's speculation beyond any relationship to reasonable costs. The answer to this lies in the availability to the State of the right to cross examination of the owner to expose the methods utilized in arriving at his figure. Any explanation of how he arrived at that value goes to the weight of his evidence.

442 P.2d 884, 886 (Ariz. Ct. App. 1968).

But, even though cross-examination and/or rebuttal evidence by a qualified expert may generally be sufficient to address landowner testimony that is believed by the other party to lack mooring in reality, a court is not required to allow the jury to consider anything and everything that

a landowner might testify to. For example, the court can instruct a jury to disregard landowner opinion testimony, or portions of it, if relevance is lacking or on Rule 403 grounds. See, e.g., District of Columbia Redevelopment Land Agency, 534 F.2d at 342-44 (district court could have instructed the jury to disregard certain portions of landowner's testimony); cf. United States v. 91.90 Acres of Land, Situate in Monroe County, Mo., 586 F.2d 79, 88-90 (8th Cir. 1978) ("In any condemnation case it is quite likely that some questionable evidence will get into the record and that some items of evidence are admissible for limited purposes only. The problem frequently, if not generally, can be taken care of by cautionary instructions given at the time at which the evidence comes in or in the course of the final instructions given to the jury by the trial court, or by initial cautionary instructions followed by similar instructions in the court's final charge to the jury."). And here, with respect to the Boyd Construction lease, the court is leaning toward excluding that evidence from the outset. Further, this court (as well as the Eighth Circuit) has the power to grant a new trial if things get too far afield to defendant's prejudice, including the ability to exercise the power of remittitur. See, e.g., United States v. 158.24 Acres of Land, More or Less, Situate in Ashley, Bradley and Union Counties, State of Ark., 696 F.2d 559 (8th Cir. 1982).

**III.   ORDER**

Based on the foregoing, the court orders as follows:

1. Defendant's Motion in Limine to Exclude Plaintiff's Expert (Doc. No. 26) is **GRANTED**. Professor Saxowsky will not be permitted to testify.

2. Defendant's Motion to Exclude Irrelevant Documents (Doc. No. 28) is **GRANTED IN PART** and **DENIED IN PART** as follows:

   a. The Vinson and Clean Energy leases will likely not be received into evidence as exhibits for consideration by the jury. However, plaintiff will be permitted

to testify about them to the extent he relies upon the leases as a basis for any landowner opinion he may offer. Plaintiff's counsel may cross-examine defendant's appraiser about them. In addition, defendant's appraiser may offer his opinions about the lease transactions. After the evidence has been presented, defense counsel can renew its motion to exclude the evidence.

    b.    The court will at this time exclude from evidence any mention of the Boyd Construction lease. During the trial, plaintiff can renew his request out of the presence of the jury to have the evidence considered and make an offer of proof. Plaintiff and plaintiff's counsel shall not make any mention of the Boyd Lease in the presence of the jury absent further order of the court.

**IT IS SO ORDERED.**

Dated this 22nd day of January, 2018.

> */s/ Charles S. Miller, Jr.*
> Charles S. Miller, Jr., Magistrate Judge
> United States District Court